## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| **JAMES F. MILLER,** Individually and on Behalf of Himself and Others Similarly Situated,<br><br>**Plaintiff,**<br><br>v.<br><br>**CARRINGTON MORTGAGE SERVICES, LLC,**<br><br>**Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)   **2:19-cv-00016-JDL**<br>)<br>)<br>)<br>)<br>) |

## ORDER ON CARRINGTON MORTGAGE SERVICES, LLC'S MOTION TO DISMISS

James F. Miller brings this putative class action against Carrington Mortgage Services, LLC ("Carrington Mortgage"), alleging that various communications he received from Carrington Mortgage after his bankruptcy discharge violated the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C.A. § 1692 *et seq*. (West 2019), and the Maine Fair Debt Collection Practices Act (MFDCPA), 32 M.R.S.A. § 11001 *et seq*. (Westlaw through Ch. 313 of 1st Reg. Sess. of 129th Leg.).  *See* ECF No. 1 ¶ 1. Carrington Mortgage moves to dismiss the complaint (ECF No. 13).  For the reasons stated below, I grant in part and deny in part the motion to dismiss.

## I.  FACTUAL BACKGROUND

The complaint alleges the following facts, which I treat as true for the purpose of evaluating the motion to dismiss.

On July 21, 2008, Miller and his then-wife executed a promissory note and mortgage in favor of Countrywide Bank, FSB, in the amount of $64,980 to finance the

purchase of their home in Washburn, Maine.  In 2010, Miller and his wife separated, and they started to fall behind on the loan.  The loan has been in arrears ever since. In October 2011, Miller and his wife divorced, and she conveyed her interest in the property to Miller.  Miller continued living at the Washburn property for a short time, but he was unable to keep up with the loan payments and fell further behind.  Miller then moved to Gray, Maine, in February 2012.

In November 2012, Miller filed for Chapter 7 Bankruptcy in the U.S. Bankruptcy Court for the District of Maine.  By that time, the mortgage had been assigned to Bank of America, which had begun servicing the loan.  Bank of America received notice of the bankruptcy filing and all subsequent filings and orders in the bankruptcy case.  As part of his Chapter 7 Individual Debtor's Statement of Intention in the bankruptcy case, Miller stated that he would surrender the Washburn property.  Miller received his bankruptcy discharge in February 2013, which resulted in the discharge of any personal obligation that Miller had on the mortgage loan. Miller has not made a payment on the mortgage loan since before he filed for bankruptcy.

Carrington Mortgage began servicing Miller's loan in September 2016 and at that time received from Bank of America the documentation of Miller's bankruptcy case and discharge.   From late 2016 until early 2018, a Carrington Mortgage representative called Miller every couple of months about resolving the amounts he purportedly owed on the loan.  Each time the representative called, Miller informed them that he had moved out of and surrendered the Washburn property, and that he had received a bankruptcy discharge.  During the same time period, Carrington

Mortgage also mailed a notice regarding debt relief and several notices regarding the purchase of force-placed hazard insurance for the Washburn property to Miller, but they were sent to an incorrect address in Gray and Miller did not receive them.  In July 2017, the loan was assigned to Wilmington Savings Fund Society, FSB ("Wilmington Savings"), as trustee for Sandwich Mortgage Loan Trust.  Carrington Mortgage continued to service the loan.

On May 9, 2018, Miller was served with a summons and foreclosure complaint for a state foreclosure action for the Washburn property, which was brought by Wilmington Savings.  The original foreclosure complaint alleged that only Miller's ex-wife was in default on the note and in breach of the mortgage, but Wilmington Savings later filed an amended complaint that sought to hold Miller liable for any deficiency balance remaining due after the sale of the property and application of the proceeds of the sale.  With the help of an attorney, Miller alerted Wilmington Savings' counsel to the fact that he was not personally liable for any deficiency balance on the loan because of his bankruptcy discharge.  Wilmington Savings amended the foreclosure complaint again to remove the request for a deficiency from Miller.

While the foreclosure case was pending, Carrington Mortgage sent Miller a series of mortgage statements, as well as letters notifying him that a hazard insurance policy had been purchased for which Miller would be required to pay, each of which Miller alleges violate the FDCPA and the MFDCPA.  The complaint alleges that the mortgage statements, the insurance letters, and the foreclosure complaint seeking a deficiency judgment against Miller caused Miller "severe emotional distress and anxiety" and led him to worry that "he would never be free from demands for

payment of the Loan and also that somehow Carrington might have found a way of getting around the bankruptcy discharge protections." *Id.* ¶ 61.

The complaint asserts violations of four provisions of the FDCPA and the MFDCPA. Specifically, the complaint alleges that through the telephone calls, forced-placed hazard insurance letters, foreclosure complaint, and monthly mortgage statements, Carrington Mortgage: (1) falsely represented the character, amount, and legal status of the loan debt; (2) used false representations and deceptive means to collect on the loan debt; (3) engaged in conduct the natural consequence of which was to harass, oppress, or abuse Miller in connection with the mortgage debt by attempting to collect the debt despite knowing of the bankruptcy discharge, and (4) used unfair or unconscionable means to collect or attempt to collect on the mortgage loan. ECF No. 1 ¶ 82.

## II. LEGAL ANALYSIS

Carrington Mortgage moves to dismiss the complaint arguing that it fails to state a claim under either the FDCPA or the MFDCPA because the communications that the complaint describes do not constitute "debt collection." *See* ECF No. 13 at 7. Therefore, Carrington Mortgage asserts, the communications are not subject to the protective measures of the FDCPA or the MFDCPA. *Id.* at 8. In addition, Carrington Mortgage raises two other arguments: (1) that to the extent the claims in the complaint are based on the phone calls from Carrington Mortgage to Miller, those claims are time-barred by the FDCPA's and MFDCPA's respective one-year limitations periods, and (2) that the MFDCPA is preempted by the Bankruptcy Code

and the Real Estate Settlement Procedures Act (RESPA) and, therefore, the claims brought under the MFDCPA must be dismissed.  *Id.* at 13-14, 17-19.

"The sole inquiry under Rule 12(b)(6) is whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintiff[], the complaint states a claim for which relief can be granted." *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 7 (1st Cir. 2011).  When resolving a motion to dismiss, courts first identify and disregard statements in the complaint that "merely offer legal conclusions" and then treat the remaining non-conclusory factual allegations as true.  *Id.* at 12 (internal quotation marks and alterations omitted).  "The make-or-break standard . . . is that the combined allegations, taken as true, must state a plausible, not a merely conceivable, case for relief." *Id.* (quoting *Sepúlveda-Villarini v. Dep't of Educ. of P.R.*, 628 F.3d 25, 29 (1st Cir. 2010)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

I address each of Carrington Mortgage's arguments in turn.

## A.   Whether Communications Constitute Debt Collection

"The basic premise of the statutory scheme" of the FDCPA[1] "is that its prophylaxis applies in connection with the collection of debts." *Arruda v. Sears, Roebuck & Co.*, 310 F.3d 13, 23 (1st Cir. 2002) (citing 15 U.S.C.A. § 1692e).  A debt is

---

[1] "Because the MFDCPA's language almost exactly tracks the FDCPA," my analysis of whether communications constitute debt collection applies equally to each statute. *Kowalski v. Seterus, Inc.*, No. 2:16-cv-00160-JAW, 2017 WL 79949, at *8 n.3 (D. Me. Jan. 9, 2017) (citing *Shapiro v. Haenn*, 222 F. Supp. 2d 29, 44 (D. Me. 2002)); *see also Hamilton v. Fed. Home Loan Mortg. Corp.*, No. 2:13-cv-00414-JAW, 2014 WL 4594733, at *18 (D. Me. Sept. 15, 2014); *In re Martel*, 539 B.R. 192, 194 n.4 (Bankr. D. Me. 2015).

"any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes[.]"  15 U.S.C.A. § 1692a(5).  "At a minimum, therefore, a complaint must allege a scenario involving the collection (or attempted collection) of a debt."  *Arruda*, 310 F.3d at 23.  "The issue at the pleading stage is whether the allegations, considered alongside the letter[s]," mortgage statements, and phone calls, "plausibly state a claim that one of the animating purposes . . . was to induce payment by the plaintiff."  *Kowalski*, 2017 WL 79949, at *12 (internal quotation marks omitted).  "[F]or FDCPA purposes, a collection letter is to be viewed from the perspective of the hypothetical unsophisticated consumer."  *Pollard v. Law Office of Mandy L. Spaulding*, 766 F.3d 98, 103 (1st Cir. 2014).  The standard is "objective" and "preserves an element of reasonableness."  *Id.* at 104.  Thus "[a] debt collector will not be held liable based on an individual consumer's chimerical or farfetched reading of a collection letter."  *Id.*

### 1. Mortgage Statements

The complaint alleges that Carrington Mortgage sent Miller four mortgage statements between July and October of 2018, which violated the FDCPA by attempting to collect on a debt for which Miller was not personally liable.  Each of the four mortgage statements includes a box on the front page titled "BANKRUPTCY MESSAGE," stating:

> **Our records show that either you are a debtor in bankruptcy or you discharged personal liability for your mortgage loan in bankruptcy.**

We are sending this statement to you for information and compliance purposes only.  It is not an attempt to collect a debt against you.

**If you want to stop receiving statements, call us or write to us at the address listed above.**

ECF No. 1-3 at 1 (emphasis in original); *see also* ECF No. 1-5 at 1; ECF No. 1-6 at 1; ECF No. 1-8 at 1.  In addition to the bankruptcy disclaimer, the first page of each mortgage statement also includes an "Explanation of Amount Due," "Payment Amount," "Payment Date," "Regular Monthly Payment" amount, "Total Payment Amount," and a detachable payment coupon with instructions to "[p]lease detach and return with your payment."  *E.g.*, ECF No. 1-5 at 1.[2]

The third page of each mortgage statement is made up of three columns of small text with bolded headings.   Under the heading "Important Notices," the following statement appears:

**Mini Miranda** – This communication is from a debt collector and it is for the purpose of collecting a debt and any information obtained will be used for that purpose. This notice is required by the provisions of the Fair Debt Collection Practices Act and does not imply that we are attempting to collect money from anyone who has discharged the debt under the bankruptcy laws of the United States.

ECF No. 1-3 at 3; *see also* ECF No. 1-5 at 3; ECF No. 1-6 at 3; ECF No. 1-8 at 3.  Several paragraphs later, a bolded paragraph under the heading "Important Bankruptcy Notice" reads:

**If you have been discharged from personal liability on the mortgage because of bankruptcy proceedings and have not reaffirmed the mortgage, or if you are the subject of a pending bankruptcy proceeding, this letter is not an attempt to collect a debt from you but merely provides informational notice regarding the status of the loan. . . .**

---

[2]  The instructions on the payment coupon is clearly legible on the August 2018 mortgage statement, *see* ECF No. 1-5 at 1, but not on the others. *See* ECF No. 1-3 at 1; ECF No. 1-6 at 1; ECF No. 1-8 at 1.

ECF No. 1-3 at 3; *see also* ECF No. 1-5 at 3; ECF No. 1-6 at 3; ECF No. 1-8 at 3.

Finally, the fourth and final page of each mortgage statement is titled "A GUIDE TO READING YOUR Chapter 7 or 11 Bankruptcy Mortgage Statement." *E.g.*, ECF No. 1-3 at 4. An image of the first page of the mortgage statement is reproduced on the right-hand side of the page with numbers next to certain items. On the left-hand side, the numbers appear in a list alongside explanations for each item. The "Guide" pages of the statements Miller received on July 5 and August 18, 2018, are identical. A copy is reproduced as an Appendix to this decision. *See* Appendix; ECF No. 1-5 at 4; ECF No. 1-3 at 4.

The "Guide" pages each of the statements that Miller received on September 18, 2018, and October 18, 2018, were changed to remove language from several of the numbered explanations that implied a request for payment. ECF No. 1-6 at 4; ECF No. 1-8 at 4. The word "due" was removed from the phrases "minimum payment due" and "payment amount due"; the phrases "the date the payment is due" and "overdue payments" were removed; and the explanation regarding the payment coupon was changed from "a coupon that should be detached and returned with your payment" to "a coupon that could be detached and returned with a payment." *Compare* ECF No. 1-3 at 4 *and* ECF No. 1-5 at 4, *with* ECF No. 1-6 at 4 *and* ECF No. 1-8 at 4.

Carrington Mortgage argues that the mortgage statements were merely informational and that because of their "prominent disclaimers," the statements do not constitute debt collection. *See* ECF No. 13 at 8 (citing *Best*, 540 B.R. 1, 11 (B.A.P. 1st Cir. 2015) ("Statements of an informational nature, even if they include a payoff

amount, are not generally actionable if they do not demand payment.”)).[3]  But the analysis does not begin and end with the bankruptcy disclaimers.  “In conducting the requisite inquiry” under the FDCPA, courts “examine the entire collection letter.” *Pollard*, 766 F.3d at 104.  I therefore look at each mortgage statement as a whole to determine whether the unsophisticated consumer would understand it to be a demand for payment.

The mortgage statements that Carrington Mortgage sent to Miller are replete with language that can be construed as a payment demand.  Although the first page of each mortgage statement contains the “Bankruptcy Message,” this disclaimer appears directly above an “Explanation of Amount Due” box, which includes dollar values for the “Regular Monthly Payment” and “Total Payment Amount.”  *E.g.,* ECF No. 1-3 at 1; *cf. In re McConnie Navarro*, 563 B.R. 127, 146-47 (Bankr. D.P.R. 2017) (finding that mortgage statements were not debt collection where they “did not include the amount of payment, a due date . . . or a past due amount” and included bold disclaimer inside “Explanation of Amount Due” box).  The detachable payment coupon also appears on the first page, along with the instruction to “detach and return with your payment.”  *E.g.*, ECF No. 1-5 at 1.  In contrast, a payment coupon that simply included a “reminder that ‘a party in a bankruptcy . . . [has the choice] to make

---

    [3]  In *Best,* 540 B.R. at 10, a debtor brought suit against a creditor for alleged violations of the Bankruptcy Code’s discharge injunction, 11 U.S.C.A. § 524(a)(2) (West 2019).  Miller argues that *Best* and other cases that concern violations of the discharge injunction are not instructive in the FDCPA context because debtors claiming a violation of the discharge injunction must meet a different standard: “coercion or harassment of the debtor.”  ECF No. 14 at 4.  In order to demonstrate a violation of the discharge injunction, however, a debtor must make the same preliminary showing as they must make in an FDCPA case: that the complained-of communication constitutes debt collection.  *Best*, 540 B.R. at 9 (“The discharge injunction . . . does not prohibit every communication between a creditor and debtor—only those designed to collect, recover or offset any such debt as a personal liability of the debtor.”) (internal quotation marks omitted).  Thus, to the extent discharge injunction cases examine whether communications constitute debt collection, they are relevant here.

a voluntary payment'" would be less likely to cause confusion.  *In re Lemieux*, 520 B.R. 361, 366 (Bankr. D. Mass. 2014) (alteration in original).  Finally, "the word 'due,' a word that indicates an attempt to collect a debt[,]" *id*., also appears on multiple pages of the mortgage statements.  *E.g.*, ECF No. 1-3 at 1-2, 4.

Additionally, the "Guide" pages at the end of each mortgage statement, especially those included in the July 5, 2018, and August 18, 2018, mortgage statements, only create more confusion by further reinforcing the impression that the dollar amounts on the first page are "due" to Carrington Mortgage.  ECF No. 1-3 at 4; ECF No. 1-5 at 4.  The "Guide" also instructs that the payment coupon "should be detached and returned with your payment."  ECF No. 1-3 at 4; ECF No. 1-5 at 4. Though that language was later removed from the September 18, 2018, and October 18, 2018, mortgage statements, the changes that were made do not render the mortgage statements sufficiently clear that they would not confuse the hypothetical unsophisticated consumer.  *See* ECF No. 1-6 at 4; ECF No. 1-8 at 4.  Furthermore, drawing all inferences in the pleader's favor at this stage of the litigation, it is reasonable to infer from Carrington Mortgage's removal of the word "due" and other language from the "Guide" page of the mortgage statements, that Carrington Mortgage recognized that the original language created the potential for confusion.

At the pleading stage, Carrington Mortgage has not "demonstrated, as a matter of law, that its disclaimer language is sufficiently clear that it is implausible that an unsophisticated debtor would believe that [the company] was attempting to collect a debt from the debtor personally."  *Gagnon v. JPMorgan Chase Bank, N.A.*, 563 B.R. 835, 844 (N.D. Ill. 2017).  I therefore conclude that the complaint, considered

alongside the mortgage statements, plausibly alleges that "one of the animating purposes" of the statements "was to induce payment" by Miller. *Kowalski*, 2017 WL 79949, at *12.

## 2. Force-Placed Hazard Insurance Letters

When a loan contract for a "federally related mortgage" requires that property insurance be maintained and the borrower does not comply with that requirement, a servicer may obtain "force-placed hazard insurance." 12 U.S.C.A. § 2605(k)(1)(A), (2) (West 2019). Force-placed insurance is "hazard insurance coverage obtained by a servicer of a federally related mortgage when the borrower has failed to maintain or renew hazard insurance on such property as required of the borrower under the terms of the mortgage." § 2605(k)(2). Before purchasing such insurance, however, RESPA requires a loan servicer to send two written notices to the borrower. § 2605(*l*)(1).[4] Both RESPA, *see* 12 U.S.C.A. § 2605(*l*)(1), and Regulation X,[5] *see* 12 C.F.R. §

---

[4] Specifically, RESPA provides that a servicer may not impose upon a borrower any charges for force-placed hazard insurance unless:

(A) the servicer has sent, by first-class mail, a written notice to the borrower containing—
    (i)  a reminder of the borrower's obligation to maintain hazard insurance on the property securing the federally related mortgage;
    (ii)  a statement that the servicer does not have evidence of insurance coverage of such property;
    (iii)  a clear and conspicuous statement of the procedures by which the borrower may demonstrate that the borrower already has insurance coverage; and
    (iv)  a statement that the servicer may obtain such coverage at the borrower's expense if the borrower does not provide such demonstration of the borrower's existing coverage in a timely manner;
(B) the servicer has sent, by first-class mail, a second written notice, at least 30 days after the mailing of the notice under subparagraph (A) that contains all the information described in each clause of such subparagraph; and
(C) the servicer has not received from the borrower any demonstration of hazard insurance coverage for the property securing the mortgage by the end of the 15-day period beginning on the date the notice under subparagraph (B) was sent by the servicer.

§ 2605(*l*)(1).

[5] Regulation X refers to Part 1024 of Title 12 of the Code of Federal Regulations, which was issued by the Bureau of Consumer Financial Protection to implement RESPA. 12 C.F.R. § 1024.1.

1024.37(c)(2) (West 2019), set out requirements for the contents of those written notices.

The complaint alleges that Carrington Mortgage sent Miller two letters regarding the purchase of force-placed hazard insurance for the mortgaged property, and that both of those letters violated the FDCPA and MFDCPA. The first letter, dated August 1, 2018, informs Miller that Carrington Mortgage had purchased hazard insurance for the Washburn property and "added the cost to your mortgage loan account." ECF No. 1-4 at 1. The following page states: "The cost of this policy will be charged to you and you will be responsible to pay for such amounts." *Id.* at 2. The fifth page of the letter includes the same "Important Bankruptcy Notice" and "Mini Miranda" which appear in the mortgage statements and are quoted above. *Id.* at 5. The second letter that Miller received is dated September 24, 2018. On the first page of that letter, the following appears:

> This is your final notice that our records show that your hazard insurance policy expired and we do not have evidence that you have obtained new coverage. **Because hazard insurance is required on your property, we bought insurance for your property.** You must pay us for any period during which the insurance we bought is in effect but you do not have insurance.

ECF No. 1-7 at 1 (emphasis in original). Otherwise, the language of the letter is the same as the first insurance letter in all material respects. *Id.* at 2, 4.

Carrington Mortgage argues that the force-placed hazard insurance letters are not debt collection because Carrington Mortgage was required to send the letters under RESPA and the letters that it sent were in a form approved by the Consumer

Financial Protection Bureau.[6]  Although RESPA and Regulation X require a loan servicer to provide written notices containing specified information to a debtor before purchasing force-placed hazard insurance, they do not mandate that those notices contain specific language. *See* 12 U.S.C.A. § 2605(*l*)(1); 12 C.F.R. § 1024.37(c)(2).  The first page of each force-placed insurance letter that Carrington Mortgage sent to Miller mirrors a model force-placed insurance notice form promulgated by the CFPB. *Compare* ECF No. 1-4 at 1, *with* App'x MS-3 to 12 C.F.R. Part 1024, Model MS-3(D); *compare* ECF No. 1-7 at 1, *with* App'x MS-3 to 12 C.F.R. Part 1024, Model MS-3(B). But the fact that Carrington Mortgage followed the CFPB's form letters in part does not establish that the letters do not constitute debt collection under the FDCPA, especially when viewing the letters "from the perspective of the hypothetical unsophisticated consumer." *Pollard*, 766 F.3d at 103.

The "[y]ou must pay us" language that appears in Model MS-3(B), *see* App'x MS-3 to 12 C.F.R. Part 1024, Model MS-3(B), and Carrington Mortgage's letter to Miller dated September 24, 2018, *see* ECF No. 1-7 at 1, may be entirely appropriate in the average case where a debtor has failed to maintain hazard insurance.  But that same language may nevertheless be inappropriate when a loan servicer is sending the letter to a debtor who has been discharged in bankruptcy.  It is plausible that an unsophisticated consumer reading that language would understand the letter to be a demand for payment.  Furthermore, Carrington Mortgage did not send only the language that appears in the form letters, but added additional pages to the letters,

---

[6] Carrington Mortgage also argues that the MFDCPA claims in the complaint are pre-empted by RESPA to the extent that they are based on the force-placed hazard insurance letters.  However, because I ultimately conclude that the MFDCPA claims are preempted by the Bankruptcy Code, *see infra* Section II(B), I do not reach the issue of whether the MFDCPA is preempted by RESPA.

including language on the second page that informs the recipient that the cost of the policy either has or will be "charged to you" and that the person is or will be "responsible to pay for such amounts." ECF No. 1-4 at 2; ECF No. 1-7 at 2. That language further reinforces the impression that the purpose of the letter was to induce payment. It is also noteworthy that the letters do not include a bankruptcy disclaimer on the first page; instead, a generic bankruptcy disclaimer appears several pages into each letter. *See* ECF No. 1-4 at 5; ECF No. 1-7 at 4.

Finally, some courts have concluded that a force-placed hazard insurance letter must induce payment by the debtor on the underlying mortgage debt for the letter to constitute debt collection under the FDCPA. *See, e.g., McCamis v. Servis One, Inc.*, No. 8:16-CV-1130-T-30AEP, 2016 WL 4063403, at *3 (M.D. Fla. July 29, 2016). But under the FDCPA, a "debt" is defined as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes[.]" 15 U.S.C.A. § 1692a(5). Hazard insurance is an obligation to pay money that arises out of the mortgage transaction between the creditor and the debtor. Therefore, a demand for payment of hazard insurance is fairly treated as debt collection under the FDCPA.

I therefore conclude that the Complaint plausibly alleges that the force-placed hazard insurance letters constitute debt collection under the FDCPA.

### 3. Wilmington Savings Fund Society, FSB's Foreclosure Complaint

Miller's complaint alleges that the amended foreclosure complaint that Wilmington Savings filed in state court, which sought "as relief that the [c]ourt [f]ind

James Miller a/k/a James F. Miller liable for any deficiency balance," violated the FDCPA.  ECF No. 1 ¶ 43 (internal quotation mark omitted).  The complaint also alleges that "Carrington was responsible for directing and facilitating the foreclosures on [Wilmington Savings'] behalf[,]" *id.* ¶ 39, and Miller argues that because Carrington Mortgage "directed the filing[,]" Carrington Mortgage is liable for the amended foreclosure complaint under the FDCPA.  ECF No. 14 at 17-18. Practically speaking, therefore, the Complaint seeks to impose vicarious liability on a debt collector for an action taken by the creditor for whom it was acting as a loan servicer.  Carrington Mortgage responds that it cannot be held "liable under [the] FDCPA or MFDCPA for 'facilitating' or directing" an alleged FDCPA violation by a creditor that is not subject to the FDCPA.  ECF No. 15 at 6; *see also Obduskey v. McCarthy & Holthus LLP*, 139 S. Ct. 1029, 1031 (2019) ("The Fair Debt Collection Practices Act regulates 'debt collector[s].'") (quoting 15 U.S.C.A. § 1692a(6)); 15 U.S.C.A. § 1692a(6) (defining "debt collector" as a person who collects or attempts to collect debts owed to another).

Courts have imposed vicarious liability on debt collectors for the actions of an agent that the debt collector employs to collect debts on its behalf.  *Oberther v. Midland Credit Mgmt., Inc.*, 45 F. Supp. 3d 125, 130 (D. Mass. 2014) ("[U]nder 'agency principles' a principal entity which meets the definition of a 'debt collector' may be held vicariously liable for the acts of its 'authorized or apparent agent under the FDCPA.'") (quoting *Alger v. Ganick, O'Brien & Sarin*, 35 F. Supp. 2d 148, 153 (D. Mass. 1999)); *see also Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 405 (3d Cir. 2000) ("[A]n entity that is itself a 'debt collector'—and hence subject to the FDCPA—

should bear the burden of monitoring the activities of those it enlists to collect debts on its behalf."), *abrogated on other grounds by Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718 (2017).   Here, however, the complaint does not allege that Wilmington Savings was acting as Carrington Mortgage's agent when it filed the amended foreclosure complaint.   Furthermore, because Wilmington Savings is the creditor and enlisted Carrington Mortgage to service the loan, it would be implausible to infer that that was the case.

Absent any legal support for the imposition of vicarious liability on Carrington Mortgage for the actions of Wilmington Savings, I decline to impose such liability.

### 4. Telephone Calls

The complaint alleges that Carrington Mortgage made phone calls to Miller "every couple of months about resolving the amounts he allegedly owed" on the mortgage loan, starting in 2016 and continuing until "the beginning of 2018[.]"   ECF No. 1 ¶ 31.   Carrington Mortgage argues that the phone calls cannot provide a basis for liability because (1) the complaint does not establish that any phone calls that were made to Miller occurred within the limitations periods under the FDCPA and MFDCPA, and (2) the complaint fails to plausibly allege that the phone calls constitute debt collection.   I address each argument in turn.

The FDCPA and MFDCPA each require that any suit for a violation be brought within one year of the date that the violation occurred.   15 U.S.C.A. § 1692k(d); 32 M.R.S.A. § 11054(4).   The complaint was filed on January 9, 2019.   Therefore, for the claims associated with the phone calls to be timely, they need to have occurred on or after January 9, 2018.   Drawing all inferences in the pleader's favor at the motion to

dismiss stage, it is plausible to infer that any phone calls made in "the beginning of 2018," as alleged in the complaint, occurred after the first week of January.  ECF No. 1 ¶ 31.  Any calls that occurred before early January 2018 are untimely.

Carrington Mortgage argues in the alternative that the phone calls do not constitute debt collection under the FDCPA.  The only allegation in the complaint regarding the content of the phone calls is that they were "about resolving the amounts [Miller] allegedly owed on the Loan."  *Id.*  Carrington Mortgage argues that "calls to discuss alternatives to 'resolve' the debt short of foreclosing are not debt collection."  ECF No. 13 at 19; *see, e.g., In re Brown*, 481 B.R. 351, 359 (Bankr. W.D. Pa. 2012) (finding that "offering assistance to avoid foreclosure" did not constitute a demand for payment).  The complaint does not allege that Carrington Mortgage demanded payment, directly or indirectly, during the alleged phone calls, and it is unclear what a call about "resolving the amounts" owed on the loan entails, without more.  Thus, even drawing all inferences in Miller's favor, the complaint does not plausibly allege that one of the animating purposes of the phone calls was to induce payment on the debt.  *Cf. Kowalski*, 2017 WL 79949 at *15 (denying motion to dismiss FDCPA claim where, among other communications, company called debtor and threatened to foreclose if debtor did not pay the amount due on the loan).

Because the FDCPA and MFDCPA claims alleged in the complaint are not based solely on the phone calls, however, they are not subject to dismissal.  Rather, the complaint plausibly alleges that the mortgage statements and force-placed hazard insurance letters that Carrington Mortgage sent to Miller constitute debt

collection under the FDCPA and, therefore, the complaint states a claim under the FDCPA.

## B.   Preemption of the MFDCPA by the Bankruptcy Code

Carrington Mortgage argues that the Bankruptcy Code preempts the MFDCPA because the Bankruptcy Code occupies the field of claims based on attempts to collect a debt that has been discharged in bankruptcy, which implicate the discharge injunction set out in 11 U.S.C.A. § 524(a)(2).[7]  Carrington Mortgage relies on the First Circuit's decision in *Bessette v. Avco Fin. Servs., Inc.*, 230 F.3d 439 (1st Cir. 2000), *amended on denial of reh'g* (Dec. 15, 2000), arguing that the First Circuit "confirmed the bankruptcy code 'occupies the field' as it relates to discharge violation claims."  ECF No. 13 at 18 (citing *Bessette*, 230 F.3d at 447).

"[W]here there is no explicit statutory language preempting state law," one of two conditions must be present for a court to find implied preemption: (1) "the federal statutory scheme is so pervasive that Congress clearly intended to 'occupy the field' to the exclusion of state law," or (2) "a particular state law is in direct conflict with the federal law to an extent that the statutes cannot coexist."  *Bessette*, 230 F.3d at 447.  Carrington Mortgage argues only that the Bankruptcy Code occupies the field. In *Bessette*, the First Circuit concluded that the plaintiff's "state law claim for unjust enrichment for collecting debt under an improper reaffirmation agreement [wa]s

---

[7]  The Bankruptcy Code provides, in relevant part:

>    (a) A discharge in a case under this title . . .
>       (2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived[.]

11 U.S.C.A. § 524(a)(2).

preempted" by the Bankruptcy Code based on "the existence of the first condition"—a pervasive statutory scheme indicating Congress's intent to "occupy the field." *Id.* The court reasoned that because "the Code authorizes federal courts to order damages for violations of § 524 when necessary—i.e., disgorgement of unjust profit—an alternative state court remedy for unjust enrichment in these circumstances" conflicts with the extensive statutory scheme of the Bankruptcy Code. *Id.*

The court emphasized in *Bessette* that the state law remedy that the plaintiff sought overlapped with a remedy which was provided for in the Bankruptcy Code, which distinguished the facts of that case from those in *Vahlsing v. Commercial Union Insurance Co.*, 928 F.2d 486 (1st Cir. 1991), in which the court allowed a state law cause of action for a violation of the automatic stay in a bankruptcy case to go forward. *Id.* at 447-48. In *Vahlsing*, "the state law tort claims arose because the creditor, unaware of the bankruptcy proceeding, had the debtor arrested for contempt. There was no comparable overlap between a specific remedy available under the Bankruptcy Code and the state law remedies for false imprisonment, negligence, [and] abuse of process." *Id.* In contrast, where a state law cause of action targets a violation of the discharge injunction and the state law remedy overlaps with a remedy available under the Bankruptcy Code, the Bankruptcy Code preempts the state law cause of action. "[T]he broad enforcement power under the Bankruptcy Code preempts virtually all alternative mechanisms for remedying violations of the Code." *Id.* at 447.

The first question, therefore, is whether the complaint targets a violation of the discharge injunction. The statutory discharge injunction in § 524 of the

Bankruptcy Code prohibits "the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor[.]"  11 U.S.C.A. § 524(a)(2).  Carrington Mortgage's alleged conduct, which I have concluded plausibly constitutes debt collection, potentially violates the Bankruptcy Code's discharge injunction.

I next consider whether the state law remedy under the MFDCPA overlaps with a remedy available under the Bankruptcy Code.  The MFDCPA provides for civil liability in the form of actual damages, statutory damages, and costs and attorneys' fees.[8]  32 M.R.S.A. § 11054(1).  The complaint seeks all three kinds of relief provided for by the statute: (1) compensatory damages for Miller's emotional distress; (2) statutory damages of $1,000; and (3) the costs of the action and reasonable attorney's fees.  ECF No. 1 at 17.  Under the Bankruptcy Code, "a bankruptcy court is authorized

---

[8]  The MFDCPA states:

Except as otherwise provided by this section, any debt collector who fails to comply with any provisions of this Act with respect to any person is liable to that person in an amount equal to the sum of:

A. Any actual damage sustained by that person as a result of such failure;

B. In the case of any action by an individual, such additional damages as the court may allow, but not exceeding $1,000;

C. In the case of a class action:

(1) Such amount for each named plaintiff as may be recovered under paragraph A; and

(2) Such amount as the court may allow for all other class members, without regard to a minimum individual recovery, not to exceed the lesser of $500,000 or 1% of the net worth of the debt collector; and

D. In the case of any successful action to enforce the liability set out in this subsection, the costs of the action, together with a reasonable attorney's fee as determined by the court. On a finding by the court that an action under this section was brought in bad faith and for the purpose of harassment, the court may award to the defendant attorney's fees, reasonable in relation to the work expended and costs.

32 M.R.S.A. § 11054(1).

. . . to enforce the discharge injunction imposed by § 524 and order damages," and "bankruptcy courts across the country have appropriately used their statutory contempt power to order monetary relief, in the form of actual damages, attorney fees, and punitive damages" for violations of § 524. *Bessette*, 230 F.3d at 445.

The only remedy provided for in the MFDCPA that does not "overlap" with a remedy available under the Bankruptcy Code is an award of statutory damages of $1,000.  32 M.R.S.A. § 11054(1)(B).  Therefore, this is not a case where there is "no comparable overlap between a specific remedy available under the Bankruptcy Code" and the state law cause of action.  *Bessette*, 230 F.3d at 447-48.[9]  In fact, the opposite is true: there is a complete overlap in remedy, with the exception of the statutory damages for which the MFDCPA provides.  That difference, however, is not enough to show that the MFDCPA is not pre-empted by the Bankruptcy Code.  To the contrary, because "Congress has plenary power to enact uniform federal bankruptcy laws . . . '[s]tates may not pass or enforce laws to interfere with or complement the Bankruptcy Act or to provide additional or auxiliary regulations.'"  *In re Weinstein*, 164 F.3d 677, 682-83 (1st Cir. 1999) (quoting *Int'l Shoe Co. v. Pinkus*, 278 U.S. 261, 265 (1929)).

For the foregoing reasons, I conclude that the Bankruptcy Code impliedly preempts the MFDCPA.[10]  Therefore, the MFDCPA claims asserted in the complaint are dismissed.

---

[9]  The facts presented here are distinguishable from cases where the debtor brought state common law claims based on conduct that was completely unrelated to the bankruptcy discharge.  *See, e.g., Vahlsing*, 928 F.2d at 489.

[10]  As Carrington Mortgage notes in its motion, this Court's decision in *Lamprey v. Wells Fargo Home Mortg.*, No. 2:16-cv-00570-JDL, 2017 WL 3470570 (D. Me. Aug. 11, 2017) is distinguishable from this case.  In *Lamprey*,

## III.  CONCLUSION

For the reasons stated above, it is **ORDERED** that Carrington Mortgage Services, LLC's Motion to Dismiss (ECF No. 13) is **GRANTED IN PART** with respect to claims brought under the Maine Fair Debt Collection Practices Act, which are accordingly dismissed, and is **DENIED IN PART** with respect to claims brought under the Fair Debt Collection Practices Act.

**SO ORDERED.**

**Dated this 3rd day of July, 2019.**

**/s/ JON D. LEVY**
**CHIEF U.S. DISTRICT JUDGE**

---

the court rejected the argument that the plaintiff's state law claims brought under the MFDCPA and the Maine Consumer Credit Code were preempted by the Bankruptcy Code where the defendant had failed to show that the Bankruptcy Code preempted state law governing the debtor's property interests and the point at which those property interests are extinguished.  2017 WL 3470570, at *6.  Here, in contrast, Carrington Mortgage has demonstrated that the Bankruptcy Code preempts state law governing the rights of a debtor who seeks to recover under the MFDCPA for alleged acts that amount to violations of the discharge injunction.

**APPENDIX**



# A **GUIDE** TO READING YOUR
# Chapter 7 or 11 Bankruptcy Mortgage Statement

*This statement is for illustrative purposes only. Your actual statement may look slightly different depending on your mortgage type.*

**1** **Statement Date/Account Number**
Reflects the date the statement was generated and the personal account number of the loan.

**2** **Account Payment Summary**
Provides the minimum payment due for the stated month and states the date the payment is due.

**3** **Contact Us**
Reflects the options available to contact us if you need help or information. Carrington Mortgage is available to answer your call Monday-Friday, 8:00am–8:00pm, EST, or you can get answers on our website 24/7: www.CarringtonMS.com.

**4** **Bankruptcy Message**
Provides statement of your Bankruptcy status.

**5** **Account Information**
Provides an overview of the loan, including the property address, interest rate, and whether there is a penalty for paying off the loan early.

**6** **Explanation of Payment Amount**
Displays a summary of the payment due, including principal, interest, escrow, assistance amount, replacement reserve, overdue payments, and fees.

**7** **Past Payment Breakdown**
Displays a summary of payments paid last month and payments paid year-to-date including principal, interest, escrow, assistance amount, replacement reserve, overdue payments, and fees. Partial Payment (Unapplied/Suspense): Funds received that have not been applied to the account.

**8** **Payment Coupon**
Provides loan information on a coupon that should be detached and returned with your payment.

**9** **Account History**
Summary of recent account activity.

**10** **Important Messages**
Lists important messages related to the status of the loan and payments.

**11** **Transactions Since Your Last Statement**
Displays detailed information of fees and charges imposed and/or payments made since your last statement. Suspense (Unapplied/Suspense): Funds received that have not been applied to the account.

